argument now on the last of our cases for the morning, which is In Re Net Pay Solutions Inc versus the Internal Revenue Service. Mr. Slobodian. Good morning, Your Honors. My name is Mark Ian Slobodian. I represent the appellate who is the trustee in this Chapter 7 bankruptcy case. Yes, could you get a little closer to the microphone? Can you hear me now? Yes. All right. I request a one minute reserve from my time for the purpose of rebuttal. Great. You're putting a rebuttal in one minute? I've never heard of that. Well, we'll see how it goes. Well, there are really, I believe, five legal issues in this case. I'm going to concentrate on the first one, which I believe to be the most important issue, which is was a trust fund created under the terms of the ADA? And I mean, that really ought to be front and center, shouldn't it? I know that the district court did not address that issue up front first, but I mean, really, we should be asking the first instance, should we not, whether or not each transfer made by Net Pay to the IRS was or was not an interest to the debtor? Yes. And depending upon how we resolve that question, we don't have to get into any of the other issues, right? Well, if you look correctly, Your Honor, you do not have to get into the other issues. I left myself open to that. But we do have to look, I believe, at the language of 7501 of the Internal Revenue Code. I don't believe the trial court really did that. The language talks about if a person is required to withhold funds, and we get them to the IRS, and those funds are so withheld. And really, we have to look to the IRS code and the regulations. All right, so who's the person here? The employers were all persons, weren't they? They were required to withhold. They were required to collect, right? The employers, in this case, Your Honor, were the customers of the debtor. The debtor was a payroll service provider. And, yes, the customers had that obligation. And if it weren't for the PISA language and the same with pay language, I think that the IRS would have a stronger position. I still don't understand why that is not consistent with the plain language of the statute. If the employers who are customers of net pay are persons, they've collected or withheld. More specifically, they've authorized someone here on their behalf to withhold, right? Well, that's the issue, Your Honor. I believe that they did not withhold on their own. They contracted. Where does the statute say they had to do that? The statute says that the person has to be required to withhold, and the money has to be so withheld. And I read that as meaning that the person who has contracted. The fact that it was signed between the employers and net pay, a legal agreement which gave rise to a requirement that, in this case, net pay. Your Honor, I believe in this case the requirement, if you read this provision in context with the other provisions of the Internal Revenue Code, I think that what the Congress is talking about is if the statute requires you, not some contract that you may have entered into with someone else, but does the statute require you to? And here the statute requires only an employer to do these withholdings. The statute does talk about agency relationships. It does talk about if someone else does the withholding. It recognizes that that could be the case. But it's in their specific requirements. Let's shift to good old state law or very traditional equity principles. Did the five employers here ever intend to transfer their equitable interest in these funds to net pay? The five employers intended to pay net pay for services. That's what the contract said. What did they intend for net pay? I believe they did intend net pay, according to the contract, to perform payroll services. What percentage of the money turned over to net pay was payroll service fees as opposed to funds that were to be paid to the government? I don't have those exact numbers, but they were a small part. A small percentage. Comparatively smaller than the amount. Right. It would have been a small percentage. Let's look at the largest transaction at issue, the Altus transaction. That was about 30, 32. I think maybe something. I thought it was 30. It was over 30. 32, 33. Let's call it 30,000. Only a small percentage of that were fees that net pay could pocket. The great majority of that was to be turned over to the government to satisfy Altus' tax liabilities, correct? I would agree that it was a majority, but it was more than just the fees. Some of the money was turned over to pay employer contributions. That was not any type of withholding. But, yes, I would say the majority. But still, that employer contribution is money that's due to the federal government, correct? The employer contribution is. The bottom line is, I mean, I don't want to be too blunt about this, but it's simply the truth that the great majority, the overwhelming majority of the funds paid from the customers to net pay was to be held temporarily and then turned over to the United States government. It was trust money, wasn't it? Well, that's the issue, Your Honor. The majority of it was intended to be trust money. Given what is the clear intent of the employers who entered into an agreement with net pay to specifically sweep their accounts of these very amounts for the sole purpose of remitting those sums to the IRS to fulfill their obligations to transfer withholding monies, etc. It's what Congress intended. And it's what the employers intended. Your Honor, to try to tackle both of your questions at once, Congress could have very easily phrased the statute to say that if money is collected for trust fund purposes and remitted to the IRS, that money is a trust fund. That does not belong in the statute. Is it or is it not clear that we may or even should consider state law for purposes of the equitable principles that can guide us here as to whether or not there's a trust? That's a separate question in my view as to whether a trust arises under state law principles. And under the facts of this case, there is no trust under state law principles because the contract was for payroll services. The contract specified there was no fiduciary relationship. So if you go to state law, you're not going to get there. I find that to be a remarkable assertion on your part, Mr. Slobodin. You're saying these funds, consistent with Judge Slobodin's question, you're saying these funds are not held in trust. And what that means then is when office paid $32,297 to NetPay, you're saying that NetPay could have taken that money and invested it in the stock market or gone to the racetrack with it, and that would have been perfectly fine. No, that would have been a breach of contract. It would not have been a breach of a trust. So you have greater rights than in the money or your client has greater rights in the money than did the employers. As a trustee, which is my role in this case, my roles are to make sure that all creditors are treated equally. And as trustee, are you essentially arguing that it is the IRS that's the creditor here for purposes of the preferential payments? No, Your Honor. Then I don't understand how you ever get to the position you're taking. It's an unusual case. It sure is. In most preference cases, Your Honor, the trustee goes after the creditor. In this case, the law specifically allows the trustee to go after a claim, make sure it's a different transferee because it benefits the creditor. And here the creditors are the customers who benefited, and that does give me the ability to go forward. That has not been disputed. Let's talk about your aggregation theory for a minute. Why is it not the case that if we accepted your aggregation theory, it would render the statute a nullity? Because as I read your brief, you're saying that there could be multiple transactions, not only multiple transactions to one creditor, but to different creditors, and that those can be aggregated. Is that your argument? Your argument is that it doesn't have to do with one creditor. It has to do with one defendant. Right. So if one defendant makes 1,000 payments of $100 to 1,000 different creditors, you can aggregate that and say, well, that's $100,000. That's a lot more than the $5,000 statutory limit, and you're saying that those payments can be aggregated. That's not at all what I'm saying. What I'm saying is if you make one $10,000 payment to one defendant, it's no different than making 3,000, whatever it is, let's say $1,200 payment. It's no different than making three $4,000 payments. To the same creditor or to three different creditors? To the same defendant. The policy is to prevent a defendant from having to suffer through losses for very small amounts of money. Here we have one defendant. I'm sorry, one defendant. If that one defendant had received one check for $12,000 as opposed to three checks for $4,000, they're the same. They're all for different customers, though. That's true, and that's because it's a different type of proceeding. Again, to go back to my hypothetical, if there were 1,000 $100 payments for 1,000 customers of NetPay, but they all were due to the IRS, you could aggregate those. If I sued just the IRS, then I could aggregate them, yes. Is there any case law to support that? There's a Fifth Circuit case. And there are bankruptcy decisions, too, but there's no guidance within this circuit. No, there's no guidance within this, but the Fifth Circuit has said, yes, you can. How many different creditors were involved in the Fifth Circuit case? I don't know whether it was more than one creditor. I think it was just one creditor. Right. I don't know that the purpose of the exception had to do with whether it was a credit or not. In 99 out of 100 cases, it would just be one creditor because that's the typical preference claim. I think if you look at the policies of the statute, and that's a Ninth Circuit opinion that they talked about, trying to – Well, in Hales, the Fifth Circuit was dealing with a single creditor and a single judgment debt, right? And here we have the opposite facts. Well, from what I'm saying now is that's a difference that doesn't really – Well, and that was the whole thing. But I don't see, again, following up on Judge Hartiman's question and the point he just made, how you can rely on Hales when really it is holding. We concluded that the plain meaning of 547C8 and the legislative history of that provision allow multiple transfers to a single creditor. That's not this case, right? That's not technically this case, but the – It's not really, really this case. But the policy behind it – The issue with the statute doesn't say that there can't be aggregation to different creditors. The reason this has come up is because there's a question as to whether a transfer means one transfer or multiple transfers, and the statute just says when you have a case, you can aggregate a transfer, and some courts have said that means just one, and the Fifth Circuit has said when you look at the rules of construction, that doesn't mean you can aggregate multiple transfers. So it's not that anybody was trying to say – I read that to simply say that if you're going to pay – instead of writing a check for $6,000 to one creditor, you write three checks for $2,000 each. It's essentially the same. There's no difference. But that requires that there be a transactional approach with one debtor, one creditor, one – there's neutrality between the same creditor and debtor on those payments. You shouldn't get penalized for breaking the $6,000 into three checks for $2,000. Why isn't that the most natural way to read the statute? Well, because if the purpose of the statute is to protect a defendant from multiple lawsuits and to prevent judges from having to hear multiple lawsuits on very tiny sums, and to prevent defendants from throwing in the towel and letting their claim go and not defending it because it's just too small a case to defend, then the difference between whether it's to one defendant or one creditor really doesn't matter. You've got one defendant. You've got a lot of money coming to that one defendant. It's enough to warrant a case. It's enough to warrant that defendant to spend the money to defend the case. All right, Mr. Slobodian, we'll have you back in rebuttal. Thank you very much. Mr. Dale. Yes, good morning. May it please the Court, my name is Ivan Dale on behalf of the United States. Mr. Dale, let me ask you right up front. I don't know, maybe I've missed it, but I haven't seen this question before in a case, in an appellate opinion, addressed where we have what is essentially a conduit of monies this way, a company of this kind. I think I saw one case where, and it may have been a bankruptcy case, where this type of business was the debtor. But in any event, doesn't this case, doesn't perhaps our case, have really substantial implications given how many of these services exist today and how many businesses, especially small businesses, are outsourcing this kind of service? It would have very dramatic implications. If the trustee is right, then every time a payroll service company goes bankrupt, the trustee will be obligated to undo the last 90 days' worth of business. And also importantly with respect to the people who contracted with this business, they're the ones that are going to be on the hook when their taxes don't get paid. So I think it's really important to be clear about whose money the trustee is trying to collect here. That was actually going to be my follow-up question, and I had discussed that question in chambers because it doesn't figure, and there wasn't really any reason for it to figure in the briefing. But ultimately for purposes of the service, what happens with respect to these individual taxpayer slash employer accounts when the money never reaches the service? With respect to these five employers who authorized someone contracted with someone to make their tax payments for them, and money was debited for that very purpose but never reaches the service, what do the services records show with respect to these five employers? If the money was never turned over to the service in the first place, then when the... Excuse me, but is the service the IRS? The IRS, yes. And of course the money was turned over here, but perhaps I should have asked the question factually in the way it occurred here. If it goes back from the service into the debtor's trust, what are the implications for these employers of that action? These employers will be on the hook for the credit. It's essentially like balancing a check two years later. So Altus will owe the $32,000. Correct. Altus will be on the hook for the $32,000. Plus interest, maybe. Plus interest, plus potentially penalties. So I guess you were pretty unhappy then with the bankruptcy court's decision in Maryland in Ray First Pay. What happened on appeal in that case? Did that not go anywhere? Well, so that case on appeal went to the Fourth Circuit. I argued that case, and the court found on appeal that the funds that were given to First Pay by clients were held in trust and that whether or not they were for trust fund taxes, the agreements themselves were such that the clients who gave their money to First Pay never intended First Pay to be able to take it to the track, take it to Atlantic City and double up. They intended First Pay to do exactly what it said it was going to do, which is pay it over to the IRS. Right, and they did that on state law trust grounds. Correct. Is that the preferred way to do this, or is it more appropriate to just read the statute to say that, first of all, when it comes to aggregation, this should be a transactional approach, that you just can't slice it up into as many pieces as you want? Do we need to have recourse to state law trust principles, I guess, is my question. Well, we actually don't have to reach the aggregation question. That's what I was going to ask. We don't even have to reach the aggregation question, do we, if we determine that what we have is a trust here or that what we are dealing with is the interest of the debtor? Yes. If you determine that under state law what we have is either an express or even a resulting trust, then... Or a constructive trust. Or a constructive trust. It's hard to say it's an express trust, right? How do we do that? Well, the problem that we have in this case that we didn't have in the First Pay case is that there's sort of a disclaimer at the end about not intending a fiduciary relationship. I think that language is in the contract because under Section 3504 of the Internal Revenue Code, payroll service providers can expressly contract and assume responsibility for making the payments. Now, that doesn't mean the employer doesn't become liable, but it makes them more attractive to clients. Before I get off on that tangent then, what's the government's preferred holding here that under state law trust principles, this is an implied in fact trust or some other form of trust and that's the end of the matter? Or is there some other disposition the government would recommend? We led with the state law trust argument in our brief, even though the district court's decision was a little bit different. I think that's the cleanest holding under Pennsylvania law. It would be a constructive trust under Pennsylvania law, wouldn't it? Well, it can be. A constructive trust is a trust under which it would be unfair to permit net pay to pocket. Are we talking about unfairness here in the beginning of your argument? Yes, so certainly that would be ethical. I think we have even more than that. So the problem with constructive trust is that obligates the government then to come in and trace and say, all right, the money that this particular client gave to net pay, that's the money that we got. Isn't there a tracing problem here? There is. There isn't a tracing problem. There is not a tracing. No, we can pinpoint exactly when the money came into the account. It went out of the account five days later just per usual business procedure. Well, isn't it moneyed a little bit because some portion of the money was fee income that net pay was entitled to? It still traces that, can't you? I think the sweep came. So net pay gave the client an accounting, and it said you owe $11,000 in payroll, you owe $3,000 in payroll tax, and for Altus their fee was $71. But even if we don't have, even if we do not have a tracing problem in this case, you're arguing to us that the preferred course would be not to decide that this is a constructive trust because of the tracing problems that may arise in other cases? My preferred course would be a resulting trust, which doesn't necessarily feature some of the same tracing problems. In other words, this is what the clients intended, whether or not there was this disclaimer at the end. What the clients intended was when they gave the money to net pay, net pay would pay the payroll taxes, and that's what happened here. So why don't we just say that net pay never obtained an equitable interest in this property? Under 7501. Right. So it's a statutory interpretation decision that doesn't even get to the next level of question, is this a resulting trust, is it a constructive trust, is it an express trust? Well, 7501 would not necessarily, so 7501 imposes a trust with respect to amounts withheld from employee paychecks. But does it only get you as far as that? I mean, is the problem that 7501 only takes you so far, but that you need additional law or equitable principles to flesh out the nature of that trust? In general, yes. So for the four smaller payments, we don't know what portion was trust fund under 7501 or non-trust fund. And by non-trust fund, I mean the employer's own liability, the employer portion of Social Security. We don't know. We know for Altus Capital that they paid entirely a trust fund liability, but we don't know with respect to the other four. So you do have to reach the de minimis transfer exception if you're proceeding only under 7501. And that's why I say, and that's why we led with the state law trust argument first. Why are you so afraid of the de minimis argument? It seems like a slam dunk for you. Well, I mean, we're not afraid. So there's a split in the circuits on the issue of whether or not payments to a single creditor may be aggregated. Right, but we don't have that here. Our facts are so different than Hale's, right? Yeah, and no case has ever permitted aggregation of payments to multiple creditors. Are there not even any bankruptcy decisions that have done that? I mean, I know there are no circuit decisions. Every case that I have seen involves payments to or for the benefit of a single creditor. So we don't even necessarily have to disapprove of Hale's. We could just distinguish this case on its facts. I think that's right. I don't think the court has to wade into whether or not you can aggregate or not. You can say, well, this case isn't right. I think you can assume the argument that if you can aggregate, this isn't the kind of aggregation. Right, right. I think that's right. And I understand Trustee's argument to mean that, well, all the payments went to the IRS, so what's the big deal? We just have to hail the IRS into court. But the fact of the matter is this isn't the IRS's money. The IRS gets its money from Congress. This is the client's money that the IRS is collecting. They're the ones that are going to be on the hook. And you can't get around the aggregation argument simply by not notifying these affected clients of this adverse action that's being taken. Are the individuals on the hook for, let's say this money went back, if Altus couldn't afford to pay it, do the individual principals of Altus have to pay? Well, so you would probably have a willfulness defense to personal liability under 6672 of the Internal Revenue Code. So that would be a neat trick then. If I had a big company with a lot of employees and I owed a lot of money in payroll taxes, then I set up a sister corporation that would sweep out the money in my account, and then I'd use that money as house money, and if things didn't go well, let's say in the market and we went bankrupt, no harm, no foul, everybody walks away. Well, I hope that isn't the case. There is a problem with respect to what's called professional employer organizations where they kind of do that. And there were congressional hearings about these kinds of situations, the payroll service provider, the professional employer organization, the agents under 3504, sort of three different kinds of the service. And so it's definitely something on the IRS's radar even now, yes, very much. Maybe if your laws weren't so complicated, we wouldn't have this kind of chemistry. I guess that's beyond your pay grade, though. We don't write the laws. I don't think you'd complain about that result either. Are there many companies that do this, that undertake to pay other people's taxes, and have deals with the banks? It's a very common business arrangement. It is? Outsourcing is getting more and more common. Yeah. Paychecks, I think, is one of the more common or known companies. Isn't it true that the small and medium employers, they just have trouble dealing with the really complicated requirements? Isn't that the truth? It seems like a lot to put on a small accounting department to manage these payrolls. I don't see Fortune 500 companies doing this sort of thing. They generally handle their own payrolls. So it's a matter of economies of scale. Right, sure. Which is why NetPay can charge $71 to Altus for this particular service. That's not a lot of money. It really isn't, which maybe that explains why they are now in bankruptcy. Do you have anything further? No. I think it's simple enough to say because NetPay had no equitable right to its clients' tax payments. I would mention that even if that weren't the case, making tax payments is what payroll service companies do. So it certainly wasn't the ordinary course of the business or financial affairs of NetPay and the IRS for this kind of three-party arrangement. This is fairly typical, and we were the only party that introduced any evidence on this point. So we do have that alternate ground. On either of those two grounds, you can affirm the decision of the district court without reaching the de minimis transfer exception. Thank you. Thank you very much. Thank you, Your Honor. Mr. Slobodian, it is your one minute. Mr. Slobodian, why should we not be very concerned that if we rule in your favor, that some unscrupulous party would set up precisely the type of arrangement that I just posited to Mr. Dale? That unscrupulous party would still be a responsible party. It would still be responsible for the taxes. That party wouldn't get out of anything. Not individually, just corporately, right? I think individually, yes. As a responsible person, as someone who has, like the president of the company, that person will still have liability. Mr. Dale just said they have a willfulness defense. Plausible deniability, you know? Pass the buck down the road to your outsourced payroll company. I don't think that defense would hold. I mean, I may have a different opinion, but I think if someone sets up the system that you're talking about, that defense is, I don't think that defense is going to do any good. I think that will still be a responsible party. If I could, I just want to make one real quick point because I only have a few seconds here. I did find another case. It was a bankruptcy case, and it's APEX, A-A-P-E-X versus Sears, 273 VR 35, in which the court did follow my line of reasoning and looked to see whether an agency was created properly pursuant to the statute. And then I just want to say really quickly on the issue of the de minimis, if you look at the statute, it says nothing about the payments have to be to bond credit, or it just happens to be in the cases that talk about the statute. It happened to be bond credit, but my position is that that's irrelevant. Gentlemen, thank you very much. It's an interesting case, and we know an important case. It was well argued. We thank you both very much.